Filed 10/7/24

<span style="text-align:center">CERTIFIED FOR PUBLICATION</span>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SAVE OUR CAPITOL!,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DEPARTMENT OF GENERAL SERVICES,<br><br>    Defendant and Respondent;<br><br>JOINT COMMITTEE ON RULES OF THE CALIFORNIA STATE SENATE AND ASSEMBLY,<br><br>    Real Party in Interest and Respondent. | C101151<br><br>(Super. Ct. No. 23WM000094) |

        APPEAL from a judgment of the Superior Court of Sacramento County, Steven M. Gevercer, Judge.  Affirmed.

        Brown Rudnick, Stephen R. Cook and Shoshana B. Kaiser for Plaintiff and Appellant Save Our Capitol!.

        Rob Bonta, Attorney General, Tracy L. Winsor, Assistant Attorney General, Sierra S. Arballo, Russell B. Hildreth, James C. Crowder and Deborah A. Wordham, Deputy

<span style="text-align:center">1</span>

Attorneys General, for Defendant and Respondent Department of General Services and for Real Party in Interest and Respondent Joint Committee on Rules of the California State Senate and Assembly.

In this appeal, we are asked to consider the adequacy of an environmental impact report (EIR) for a project that proposes major changes to the California State Capitol. The Department of General Services and the Joint Committee on Rules of the California State Senate and Assembly (Joint Rules Committee) prepared both an EIR and a revised EIR for this project under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). We previously considered a challenge to the EIR. We now consider a challenge to the revised EIR. We will affirm the trial court's decision rejecting this challenge based on recent legislation exempting this project from CEQA's requirements.

BACKGROUND

The California State Capitol is the seat of our state government. The Capitol building and the surrounding area are known as the State Capitol Complex, which has four general components: the Historic Capitol or West Wing (the oldest part of the Capitol building that includes the Capitol dome), Capitol Park (a park covering 40 acres), the Insectary (a small building initially designed to house insect-related experiments), and most relevant here, the Capitol Annex Building or East Wing (the Annex). (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 679 (*Save Our Capitol*).) The Annex—which connects to the Historic Capitol—includes offices for the Governor, legislators, and others.

Over time, the Legislature found the Annex deficient. And so in the State Capitol Building Annex Act of 2016 (the Annex Act) (Gov. Code, § 9112 et seq.), it authorized "the Joint Rules Committee [to] pursue the construction of a state capitol building annex or the restoration, rehabilitation, renovation, or reconstruction of the State Capitol

2

Building Annex." (Gov. Code, § 9112, subd. (a)(1), added by Stats. 2016, ch. 31, § 65, eff. June 27, 2017.) Two years later, the Legislature expanded the scope of the Joint Rules Committee's authority, allowing it also to pursue the construction of "a visitor center, a relocated and expanded underground parking facility, and any related or necessary deconstruction and infrastructure work." (Gov. Code, § 9112, subd. (a)(2), as amended by Stats. 2018, ch. 40, § 1, eff. June 27, 2018.)

Following these authorizations, the Joint Rules Committee, working with the Department of General Services and the Department of Finance, proposed the Capitol Annex Project. (See Gov. Code, § 9112, subd. (b)(1).) The proposed project included "three primary components: (1) demolishing the 325,000-square-foot existing Annex attached to the east side of the Historic Capitol and constructing a new attached Annex; (2) constructing a new underground visitor/welcome center (visitor center) on the west side of the Historic Capitol between the Historic Capitol and 10th Street; and (3) constructing a new underground parking garage." (*Save Our Capitol, supra*, 87 Cal.App.5th at p. 667.)

The Department of General Services and the Joint Rules Committee (together, DGS) afterward prepared an EIR for this project. (*Save Our Capitol, supra*, 87 Cal.App.5th at p. 665.) They did so in their effort to comply with CEQA—a law requiring public agencies to prepare, or cause to be prepared, an EIR for any project they propose to carry out or approve that may have a significant effect on the environment. (Pub. Resources Code, §§ 21100, subd. (a), 21151, subd. (a).) In this and other requirements, CEQA "seeks to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488.)

After DGS certified its EIR and approved the project, two similarly named entities—Save Our Capitol! (Save Our Capitol) and Save the Capitol, Save the Trees

3

(Save the Trees)—each filed a petition for writ of mandate challenging the EIR. (*Save Our Capitol, supra*, 87 Cal.App.5th at pp. 665-666.)  These challenges ultimately led to two prior published decisions in our court.

Our first decision followed after the trial court rejected the challenges to the EIR. On appeal, we reversed in part after finding certain aspects of the EIR flawed. (*Save Our Capitol, supra*, 87 Cal.App.5th at pp. 676, 683, 695-696, 711.)  We then remanded the matter to the trial court and directed it to issue a peremptory writ of mandate consistent with our opinion. (*Id.* at p. 711.)  Our second decision followed after the trial court issued the peremptory writ, DGS revised its EIR and reapproved the project (though now without the visitor center), and the trial court then discharged the writ. (*Save the Capitol, Save the Trees v. Department of General Services* (2024) 101 Cal.App.5th 1237, 1241 (*Save the Trees*).)  On appeal, Save the Trees contended the trial court prematurely discharged the writ, reasoning that the court needed to find the revised EIR consistent with our prior decision before discharging the writ. (*Id.* at p. 1245.)  We agreed and reversed. (*Id.* at p. 1241.)

Now before us is the third appeal involving the Capitol Annex Project, and it too involves DGS's revised EIR.  After DGS certified its revised EIR, both Save Our Capitol and Save the Trees challenged it, though through different means.  As covered, Save the Trees challenged it in the existing litigation, arguing that the trial court could not discharge the writ unless DGS showed (and the trial court found) that the revised EIR was consistent with our decision in *Save Our Capitol*. (*Save the Trees, supra*, 101 Cal.App.5th at pp. 1244-1245.)  Save Our Capitol, however, pursued a different path. Rather than challenge the revised EIR in the existing litigation, it filed a new petition for writ of mandate alleging that the revised EIR failed to comply with CEQA.  It argued that in the revised EIR, DGS wrongly said the project complied with the Secretary of the Interior's Standards for the Treatment of Historic Properties and improperly omitted

4

information concerning these standards.  The trial court rejected these claims and this appeal followed.

DISCUSSION

I

*Senate Bill No. 174 Exempts the Project from CEQA*

On appeal, Save Our Capitol raises the same arguments it made at the trial level. It argues that DGS wrongly found the Capitol Annex Project compatible with the federal Standards for the Treatment of Historic Properties.  It also argues that DGS improperly omitted information concerning these standards.  For both these reasons, Save Our Capitol contends DGS violated CEQA.  We reject these arguments based on recent legislation exempting the Capitol Annex Project from CEQA's requirements.

At the time Save Our Capitol filed its appeal in this case, the Capitol Annex Project was subject to CEQA, albeit an expedited version of CEQA.  (*Save Our Capitol, supra*, 87 Cal.App.5th at p. 666.)  But after two adverse appellate decisions, and with this third appeal pending, the Legislature decided to exempt the project from further CEQA review.  With Senate Bill No. 174 (2023-2024 Reg. Sess.) (Senate Bill 174), the Legislature amended the Annex Act to provide that "all work performed pursuant to this [act] shall be exempt from" CEQA's requirements.  (Gov. Code, § 9112, subd. (c)(1)(F), as amended by Stats. 2024, ch. 74, § 2, eff. July 2, 2024.)  It also stated that Senate Bill 174 "shall take effect immediately."  (Stats. 2024, ch. 74, § 10.)  Most bills cannot take effect immediately under the California Constitution.  (Cal. Const., art. IV, § 8, subd. (c)(1).)  But Senate Bill 174 could because apart from providing this CEQA exemption, it also "provid[ed] for appropriations related to the budget bill" and was "identified as related to the budget in the budget bill passed by the Legislature."  (Cal. Const., art. IV,

5

§ 12, subd. (e); Stats. 2024, ch. 74, §§ 5, 10; see Stats. 2024, ch. 35, § 39.00 [the budget bill].)[1]

Senate Bill 174 dictates the result in this appeal. Although it became effective after Save Our Capitol filed its appeal, "[i]n mandamus proceedings, a reviewing court applies the law that is current at the time of judgment in the reviewing court." (*Make UC a Good Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43, 55.) The Annex Act, as recently amended by Senate Bill 174, is the current law here. And applying that law to this case, we must reject Save Our Capitol's claims that DGS violated CEQA. Save Our Capitol's claims, after all, concern "work performed pursuant to" the Annex Act (Gov. Code, § 9112, subd. (c)(1)(F))—namely, DGS's work on the Capitol Annex Project. Per Senate Bill 174, that work is now expressly exempt from CEQA's requirements. (Gov. Code, § 9112, subd. (c)(1)(F).) So Save Our Capitol cannot prevail on its claims that DGS violated CEQA's requirements.

II

*DGS's and Save Our Capitol's Arguments*

Neither Save Our Capitol nor DGS reads Senate Bill 174 differently. But each favors a different resolution for this case.

DGS, to start, argues that Senate Bill 174 renders this appeal moot, reasoning that the new law makes it impossible for Save Our Capitol to receive effective relief. DGS first raised this argument in a motion to dismiss filed shortly after the enactment of Senate Bill 174. But we denied the motion, stating that the mootness doctrine does not apply. DGS raises its mootness argument once more in its briefing on the merits. But

---

[1] At DGS's request, we take judicial notice of Senate Bill 174, approved by the Governor on July 2, 2024. And at Save Our Capitol's request, we take judicial notice of an early version of Senate Bill 174 (Assem. Amend. to Sen. Bill No. 174 (2023-2024 Reg. Sess.) June 22, 2024). (Evid. Code, §§ 452, 459.)

once more, we reject its argument. As our Supreme Court recently reiterated, " '[a] case becomes moot when events " 'render[] it impossible for [a] court, *if it should decide the case in favor of plaintiff*, to grant him any effect[ive] relief.' " ' " (*Make UC a Good Neighbor v. Regents of University of California, supra*, 16 Cal.5th at p. 65.) But Senate Bill 174 "does not make it impossible for a court to provide [Save Our Capitol] relief if it were to decide the case in [Save Our Capitol's] favor." (*Make UC a Good Neighbor,* at p. 65.) It instead "makes clear that [Save Our Capitol] is not entitled to relief. Stated differently, the recent legislation does not moot the case" but instead "determines who prevails" on the merits, requiring us to reject Save Our Capitol's claims that DGS violated CEQA. (*Make UC a Good Neighbor,* at p. 65.)

Save Our Capitol, in turn, raises a more complicated argument. It argues that Senate Bill 174 is unconstitutional under article IV, section 28 of the California Constitution (article IV, section 28). Article IV, section 28—added in 1980 when voters approved Proposition 3—limits the Legislature's ability to make alterations to certain parts of the Historic Capitol, including by barring the Legislature from authorizing or appropriating funds for such work through a statute that would become effective immediately as an urgency statute. It states, in relevant part: "[N]o bill shall take effect as an urgency statute if it authorizes or contains an appropriation for . . . the alteration or modification of the color, detail, design, structure or fixtures of the historically restored areas of the first, second, and third floors and the exterior of the west wing of the State Capitol from that existing upon the completion of the project of restoration or rehabilitation of the building conducted pursuant to Section 9124 of the Government Code as such section read upon the effective date of this section." (Art. IV, § 28, subd. (a); see also Stats. 1975, ch. 246, § 1, p. 639 [showing Gov. Code, § 9124 on the effective date of article IV, section 28].)

Save Our Capitol makes two general points to advance its argument. First, it asserts that Senate Bill 174 appropriates funds for altering the Historic Capitol's exterior.

7

That is so, it says, because the bill appropriates funds for work authorized under the Annex Act—including the construction of a visitor center—and a conceptual sketch of the visitor center in the revised EIR "depicts an entry into the visitor center through the exterior wall of the historic Capitol, which would require breaking a hole through that exterior." It acknowledges, however, that while the revised EIR discussed a visitor center, DGS ultimately approved the project without the visitor center. (*Save the Trees, supra*, 101 Cal.App.5th at p. 1241.) Second, it asserts that the public never had a meaningful opportunity to scrutinize Senate Bill 174, having been signed into law to take effect immediately only 10 days after its language was first proposed. For these two reasons, Save Our Capitol contends Senate Bill 174 undermines Proposition 3's purpose—which it says, quoting the ballot pamphlet argument in favor of Proposition 3, was to give citizens notice " 'in advance of any proposal to alter or modify the Capitol' " and " 'an opportunity to express themselves before changes are made to it.' " (Ballot Pamp., Primary Elec. (Jun. 3, 1980) argument in favor of Prop. 3, pp. 12-13.)[2]

To prevail on its argument, however, Save Our Capitol must clear several hurdles. DGS mentions five. First, DGS notes that article IV, section 28 purports to cover only "urgency statute[s]" and Senate Bill 174 is not an urgency statute. Second, it contends Senate Bill 174 is phrased to avoid any conflict with article IV, section 28, specifying that the appropriated funds "shall not be used to alter or modify the color, detail, design, structure or fixtures of the historically restored areas of the first, second, and third floors and the exterior of the west wing of the State Capitol unless the Legislature expressly appropriates those moneys for that purpose in accordance with subdivision (b) of Section 28 of Article IV of the California Constitution." (Gov. Code, § 14692, subd. (a)(2)(C)(vi), as amended by Stats. 2024, ch. 74, § 5, eff. July 2, 2024.) Third, it argues

---

[2] At Save Our Capitol's request, we take judicial notice of the ballot pamphlet materials for Proposition 3. (Evid. Code, §§ 452, 459.)

that any modifications to the Historic Capitol are funded through appropriations outside of Senate Bill 174, citing a 2018 law (Stats. 2018, ch. 40, § 5) and a 2021 law (Stats. 2021, ch. 251, § 6).[3]  Fourth, it asserts that Senate Bill 174 does not even appropriate funds for the Capitol Annex Project; it instead provides a timeline for distributing funds already appropriated.  And fifth, it contends Save Our Capitol's argument is premised on speculation about the potential construction of a visitor center in the future.

Without needing to address all these issues, we agree with DGS that Save Our Capitol's argument falls short.  But before explaining why, we make a note about article IV, section 28's history and scope.  The California Constitution describes several types of bills that can become effective immediately.  (Cal. Const., art. IV, §§ 8, subd. (c)(3), 12, subd. (e)(1).)  Article IV, section 28 purports to cover only one type:  urgency statutes.  This focus on urgency statutes makes sense given Proposition 3's historical context.  At the time voters approved Proposition 3, a bill like Senate Bill 174 needed to be passed as an urgency statute to take effect immediately.  That is because Senate Bill 174 is a so-called "trailer bill" that accompanied and implemented the budget bill, and in 1980, these types of bills could take effect immediately only as urgency statutes—which required passage with a two-thirds vote.  (Cal. Const, art. IV, § 8, subd. (d); *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1097; Ballot Pamp., Primary Elec. (Nov. 2, 2010) analysis of Prop. 25 by the Legis. Analyst, p. 52.)

The law, however, has changed since 1980.  Three decades after approving Proposition 3, voters approved Proposition 25.  That proposition amended the California Constitution to allow the Legislature to pass, with a simple majority vote, "the budget bill

---

[3]  At Save Our Capitol's request, we take judicial notice of the two bills enacting these laws (Assem. Bill No. 1826, approved by the Governor June 27, 2018 (2017-2018 Reg. Sess.) and Assem. Bill No. 163, approved by the Governor Sept. 23, 2021 (2021-2022 Reg. Sess.)).  (Evid. Code, §§ 452, 459.)

and other bills providing for appropriations related to the budget bill . . . to take effect immediately. . . .” (Cal. Const., art. IV, § 12, subd. (e).) So while trailer bills providing for appropriations related to the budget bill once could take effect immediately only as urgency statutes passed with a two-thirds vote, they now can take effect immediately as “bills providing for appropriations related to the budget bill” passed with a majority vote. Senate Bill 174 is a product of Proposition 25. It became effective immediately as a bill “providing for appropriations related to the budget bill,” not as an urgency statute. (Stats. 2024, ch. 74, §§ 5, 10.)[4]

That leads to a dispute among the parties about article IV, section 28’s scope. According to DGS, we should read article IV, section 28 literally and limit its application to urgency statutes—making it inapplicable to Senate Bill 174 for this reason alone. But according to Save Our Capitol, we should eschew a literal reading of article IV, section 28, for a literal reading would render Proposition 3 effectively meaningless following Proposition 25. Save Our Capitol has a point. Suppose the Legislature sought to accomplish precisely what Proposition 3 was designed to prevent—to authorize or appropriate funds for alterations to the Historic Capitol’s exterior and historically restored areas through a statute that would become effective immediately. Under DGS’s literal reading of article IV, section 28, the Legislature could enact a trailer bill under Proposition 25’s procedures to accomplish these ends and thereby bypass article IV, section 28’s limitations. In its view, then, Proposition 25 effectively overturned Proposition 3. And it did so even though no part of Proposition 25’s ballot materials suggested that the proposition’s passage would have this effect.

In the end, however, we need not resolve whether Proposition 3 survived Proposition 25. Even assuming that article IV, section 28 potentially covers all bills

---

[4] At Save Our Capitol’s request, we take judicial notice of the ballot pamphlet materials for Proposition 25. (Evid. Code, §§ 452, 459.)

enacted to take effect immediately, and not just urgency statutes, we still find article IV, section 28 inapplicable here. That is because, as DGS notes, Senate Bill 174 explicitly bars funds from being used inconsistent with article IV, section 28. Senate Bill 174 generally provides that $700 million must be transferred from the General Fund to the State Project Infrastructure Fund, and then to the Operating Funds of the Assembly and Senate, to be used for the capital outlay projects specified in the Annex Act. (Gov. Code, §§ 9112.5, subd. (b), 14692, subd. (a)(2)(C)(i), (v), as amended by Stats. 2024, ch. 74, § 3, eff. July 2, 2024.) But it then provides that these funds "shall not be used to alter or modify the color, detail, design, structure or fixtures of the historically restored areas of the first, second, and third floors and the exterior of the west wing of the State Capitol unless the Legislature expressly appropriates those moneys for that purpose in accordance with subdivision (b) of Section 28 of Article IV of the California Constitution." (Gov. Code, § 14692, subd. (a)(2)(C)(vi), as amended by Stats. 2024, ch. 74, § 5, eff. July 2, 2024.)

By its express terms, then, Senate Bill 174 does not allow these funds to be used inconsistent with article IV, section 28. Save Our Capitol ultimately appears to acknowledge as much. But it suggests that DGS cannot be trusted to comply with Senate Bill 174's restrictions on the use of these funds. It also worries that the public will be unable to monitor DGS's compliance with Senate Bill 174. But at bottom, Save Our Capitol evinces a concern that DGS might violate Senate Bill 174, not that Senate Bill 174 itself violates article IV, section 28. In its view, DGS might approve a visitor center under the Annex Act in the future, this visitor center might alter the Historic Capitol's exterior, and DGS might use part of the $700 million in Senate Bill 174 to accomplish this alteration—despite Senate Bill 174's language limiting the use of this money. But this hypothetical future scenario is not before us. And focusing on Senate Bill 174, we reject Save Our Capitol's claim that the bill itself violates article IV, section 28.

11

## DISPOSITION

The judgment is affirmed. DGS is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

/s/
BOULWARE EURIE, J.

We concur:

/s/
HULL, Acting P. J.

/s/
WISEMAN, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.